Dennis L. Landis, Petitioner *v.* Workmen's Compensation Appeal Board (Hershey Equipment Corporation), Respondents.

Submitted on briefs May 6, 1985, to Judges ROGERS, MACPHAIL and PALLADINO, sitting as a panel of three.

*Dennis L. Plant, Going & Wiker,* for petitioner.

*W. Jeffrey Sidebottom, Barley, Snyder, Cooper & Barber,* for respondents.

OPINION BY JUDGE ROGERS, August 20, 1985:

Dennis Landis has appealed from an order of the Workmen's Compensation Appeal Board (board) which affirmed a referee's dismissal of his claim petition in which he had alleged disability by reason of a disease resulting from his employment.

From 1972 through 1975, the claimant serviced and installed poultry equipment in chicken houses for the Hershey Equipment Corporation. In November, 1975, he experienced distorted vision in his right eye. He has by his physician's description a small blind spot in the central portion of the visual field in the right eye. He retains peripheral vision in his right eye. His condition was diagnosed as presumed ocular histoplasmosis, an allergic reaction to the presence in the blood stream of histoplasmosis organisms. The or-

ganisms just mentioned are in fungus which grows in some soils which it is believed are fertilized by fowl droppings. The claimant quit his employment with Hershey Equipment upon learning these facts from his treating ophthalmologist.

Because presumed ocular histoplasmosis is not a disease specifically named as compensable in Section 108 of The Pennsylvania Workmen's Compensation Act (Act),[1] the claimant had the burden under Section 108(n) of proving that he suffered from a disease:

> (1) to which the claimant . . . [was] exposed by reason of his employment, and (2) which . . . [was] causally related to the industry or occupation [in which he worked], and (3) the incidence of which is substantially greater in that industry or occupation than in the general population.

The referee found that the claimant failed to prove any of these requirements. The board affirmed the referee's order on the ground that the medical testimony adduced by the claimant was equivocal on the point of whether the incidence of presumed ocular histoplasmosis is substantially greater in the poultry equipment industry or occupation than it is in the general population.

The claimant contends that the totality of the testimony of his medical expert was not equivocal and satisfied all of the three tests of Section 108(n). The claimant's expert, Dr. Paul Nase, an ophthamologist, was a well-qualified, careful and articulate witness. It is necessary to reproduce almost the whole of his testimony:

> A. The presumptive diagnosis [of the claimant] was that [he] had presumed ocular

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §27.1.

histoplasmosis with macular inflammation from his ocular histoplasmosis.

A. Presumed ocular histoplasmosis is caused by a fungus that is probably transmitted by inhalation from contaminated soil. It gets into the lungs and subsequently into the blood-stream.

. . . .

A. [The claimant] had all of the findings of presumed ocular histoplasmosis.

. . . .

A. The ocular involvement with relation-ship to the fungus, since the fungus has never been isolated from patients who have the pre-sumed ocular histoplasmosis syndrome, it is presumed that this is a type of sensitization and subsequent allergic reaction in the ocular tissue from histoplasmosis organisms which are else-where in the body.

. . . .

A. It is felt that this is present in endemic areas, which include the major river valleys in this hemisphere and include the northern part of this country; that the fungus is present in the soil and probably fertilized by fowl which would include chickens, pigeons, starlings, bats, and other fowl.

. . . .

A. [The claimant's] occupation presents him with the potential exposure to the histoplas-mosis organism.

. . . .

Q. Doctor, to the best of your knowledge, is this histoplasmosis condition characterized—

how would you characterize the rate of occurrence of this disease?

A. I have no idea in this area.

Q. In your opinion, Doctor, would an individual in an occupational capacity such as [the claimant] have a greater risk of exposure than say you or I?

A. Yes.

Q. Is there any information or knowledge as to how much a greater risk is available to him at the present time.

A. Not to my knowledge.

. . . .

Q. Doctor, you had previously referred to the percentage loss in the right eye, the macular area, when we were talking about the vision. Is it your opinion that this came about as a result of a presumed ocular histoplasmotic condition?

. . . .

A. [The claimant] has had a permanent loss of macular function in his right eye as a result of presumed ocular histoplasmosis.

A. The term presumed ocular histoplasmosis is utilized because the organism has never been found in the ocular tissue in patients that have had all the clinical findings of the syndrome.

It is the working hypothesis that this is a type of allergic reaction in the eye to the presence of the organism elsewhere in the body.

. . . .

Q. It is just like anyone else having an allergy . . . some people are affected by the presence of certain allergens and others are not.

A. That is correct. In population studies in endemic areas, the incidence of positive ocular findings may be only two percent in people that have positive skin tests to histoplasmosis indicating the presence of the organism somewhere else in the body.

. . . .

A. The studies that have been done of the rate of exposure, seems to be highest in people who have occupations related to exposure to . . . fowl.

Q. Is it just being around an area where pigeons may be populated that one could pick up the disease?

A. I don't know the answer to that question. The present feeling is that the fungus organism is present in the soil in these endemic areas and seemingly with a higher concentration of the organism in places where there are this type of fowl.

. . . .

Q. Am I correct that the handling of the excrement by itself does not set off the disease process you have described going into the lungs and into the bloodstream?

A. I don't know the answer to that question.

Q. All you know is that it is in the soil?

A. That is correct.

Q. And somehow it gets from the soil into the air, into the lungs, into the bloodstream, and to the ocular nerve?

A. That is the mechanism as we know it today.

Q. Are there any other known causes of presumed ocular histoplasmosis?

A. No.

The employer adduced no medical evidence.

We respectfully disagree with the referee and the board that Dr. Nase's testimony was on essential matters equivocal or that it did not provide sufficient proof that (1) the claimant was exposed to presumed ocular histoplasmosis by reason of his employment, (2) that the disease was causally related to his employment, and (3) that the incidence of the disease is substantially greater in his occupation of working in poultry houses than in the general population. Dr. Nase was called as a witness because expert testimony concerning the claimant's condition was required for proof of the claimant's injury and its cause. Dr. Nase and his medical colleagues call this rare ailment[2] afflicting the claimant's right eye presumed ocular histoplasmosis. It is significant that the first adjective is "presumed" not "assumed". The word presumed when employed by scientists in scientific discussion, as Dr. Nase's testimony shows, has the meaning "to accept as true or credible in the absence of positive scientific proof" and not, as the referee and board may have concluded, the meaning "to accept arbitrarily" or "to take for granted," phrases synonymous with the word assumed.

Dr. Nase testified that histoplasmosis is the name given to a disease endemic in major river valleys caused by infection with a fungus;[3] that it is believed that the fungus is fertilized by fowl, including chickens; that perhaps two percent of the persons who have

[2] The referee writes that in eleven years he has heard 4400 cases and that this is only the second involving presumed ocular histoplasmosis.

[3] The name of the disease is histoplasmosis; the name of the fungus is histoplasma; and the name of the culture used in skin tests for the disease is histoplasmin. The three words are defined in Webster's Third New International Dictionary.

skin tests positive to histoplasmosis also have positive ocular findings; that the term *presumed* ocular histoplasmosis is used because the organism, histoplasma, has never been found in ocular tissue; and that it is presumed that ocular histoplasmosis syndrome is an allergic reaction in the ocular tissue from the organisms elsewhere in the body.

Dr. Nase was not equivocal with respect to the three proofs required of the claimant—that the claimant was exposed to presumed ocular histoplasmosis by reason of his employment; that the disease was causally related to his employment; and that the incidence of the disease is substantially greater in the claimant's occupation at chicken houses than in the general population. Dr. Nase testified that the claimant's "occupation presents him with the potential exposure to the histoplasmosis organism" and that the claimant was at greater risk than "you or I." Concerning causation, Dr. Nase testified that the claimant had "all of the findings" of presumed ocular histoplasmosis; that he has suffered "a permanent loss of macular function as a result of presumed ocular histoplasmosis"; and that the only known cause of presumed ocular histoplasmosis is through exposure to the histoplasmosis organism. On the subject of whether the incidence of the disease was greater in the claimant's occupation in chicken houses than in the general population, Dr. Nase testified, as noted, that the claimant's occupation exposed him to greater risk than persons not so employed; that there is a "higher concentration of histoplasmosis organisms in places where there are those types of fowl"; that there is "no other known cause" of presumed ocular histoplasmosis than exposure to histoplasmosis organisms; and, as earlier noted, that only two percent of persons testing positively for histoplasmosis contract presumed ocular histoplasmosis.

Dr. Nase did not use the phrase "the incidence of which, is substantially greater in [the claimant's occupation] than in the general population" nor was it necessary for him to do so. *Berry v. Workmen's Compensation Appeal Board,* 86 Pa. Commonwealth Ct. 95, 483 A.2d 1066 (1984). His testimony that persons who work among fowl have greater exposure to histoplasmosis than persons who do not, that only persons positive for histoplasmosis exhibit the presumed ocular syndrome, and that only two percent of persons having histoplasmosis contract presumed ocular histoplasmosis sufficiently demonstrate that the incidence of presumed ocular histoplasmosis is substantially greater in the claimant's occupation than in the general population.

The claimant also contends that he established the specific loss of use of his right eye under Section 306 (c) of the Act, 77 P.S. §513. We explained in *Hershey Estates v. Workmen's Compensation Appeal Board,* 9 Pa. Commonwealth Ct. 470, 308 A.2d 637 (1973), that

> [t]he ultimate test . . . is that of whether the injured eye was lost for all practical intents and purposes, not whether claimant in fact has vision in the injured eye. . . . Compensation may not be had if, using both eyes, the claimant can see better, in general, than by using the uninjured eye alone. . . . (Citations omitted.)

*Id.* at 473, 308 A.2d at 639.

Dr. Nase testified that the claimant has lost a small segment of vision in the center of his total field of vision from the right eye but that his peripheral field is completely normal in the right eye. He also testified that depth perception is a function of two eyes, and the peripheral field vision in the claimant's right eye works in conjunction with the vision in the

claimant's left eye to give the claimant "some degree of depth perception."

On cross-examination, he stated:

Q. I take it therefore that his vision with two eyes is still better than if it was with one eye?

A. Yes.

Because the claimant is able to see better using both eyes than by using his uninjured eye alone, we must uphold the board's finding that the claimant did not prove specific loss of the use of his right eye.

Order reversed and record remanded for an award appropriate to the circumstances. Jurisdiction is relinquished.

ORDER

AND Now, this 20th day of August, 1985, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is reversed and the record is remanded for an award appropriate to the circumstances. Jurisdiction is relinquished.